IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-06-089-2 |
| | § | CIVIL ACTION NO. H-08-2825 |
| JUAN A. ESCOBAR, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Juan A. Escobar's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 419),[1] and Memorandum in Support (Document No. 420), the United States' Answer, and Motion to Dismiss (Document No. 423), and Movant's Response to the United States' Motion to Dismiss (Document No. 422). After reviewing Movant's § 2255 Motion, and Memorandum, the Government's Answer and Motion to Dismiss, and Movant's Response to the Government's Motion to Dismiss, the record of the proceedings before the District Court in the underlying criminal case, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss (Document No. 423) be GRANTED, that Movant's Motion to Vacate, Set Aside, or Correct Sentence (Document No. 419) be DENIED, and that this § 2255 proceeding be DISMISSED.

---

[1] Juan A. Escobar's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-08-2825 and at Document No. 419 in Criminal Action No. H-06-89. References hereafter will be to the Criminal Document numbers unless otherwise indicated.

I.      **Procedural History**

Movant Juan A. Escobar ("Escobar"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255. This is Escobar's first attempt at § 2255 relief.

On March 21, 2006, Escobar, along with Bonifacio Hernandez, Leon Baldomero DeLeon, Sugentino Percel, Eric Vasquez, Leonardo Arcemio Garcia, Jesus Alejandro Osorio, and German Arias ,was charged by Indictment with drug trafficking activities. In particular, Escobar was charged with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A)(ii) (Count one), and possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) &841(b)(1)(A)(ii), and 18 U.S.C. § 2 (Count two). (Document No. 22). On November 3, 2006, Escobar, pursuant to a written Plea Agreement, pleaded guilty to Count one of the Indictment. (Document Nos. 157, 160, Transcript of Rearraignment Hearing, Document No. 382). Under the written Plea Agreement pursuant to Rule 11(c)(1)(A) and (B), Escobar agreed to plead guilty to Count one. (Document No. 160, ¶ 1). In addition, Escobar agreed to: (1) cooperate and debrief with the Government, (2) forfeit property, and (3) waive his right to appeal and collaterally attack his conviction. (Document No. 160, ¶¶ 7, 8, 9, 10, 11). The Government agreed to: (1) dismiss the remaining count of the Indictment, (2) not oppose Escobar receiving credit for acceptance of responsibility (3) not request an upward adjustment for aggravating role in the offense pursuant to U.S.S.G. 3B1.1, and (4) recommend a sentence at the low end of the advisory Sentencing Guidelines range. (Document No.

160, ¶ 12).  With respect to the waiver of appeal rights, including the right to bring a § 2255 motion,

and the calculation of Escobar's sentence, the written Plea Agreement provided in pertinent part:

> 9.  Defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined **on any grounds set forth in 18 U.S.C. § 3742**.  Additionally, the defendant is aware that 28 U.S.C. § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final.  The defendant waives the right to contest his/her conviction or sentence by means of any post-conviction proceeding.

> 10.  In agreeing to these waivers, defendant is aware that a sentence has not yet been determined by the Court.  The defendant is also aware that any estimate of the possible sentencing range under USSG that he/she may have received from his/her counsel, the United States or the United States Probation Office ("PSPO"), is a prediction, not a promise, **did not induce his/her guilty plea** and is not binding on the United States, the USPO, or the Court.  The United States does not make any promise or representation concerning what sentence the defendant will receive.  Defendant further understands and agrees that the USSG are "effectively advisory" to the Court.  United States v. Booker, 543 U.S. 220, 245 (2005).  Accordingly, defendant understands that, although the Court must consult the USSG and must take them into account when sentencing defendant, Booker, 543 U.S. at 264, the Court is not bound to follow the USSG nor sentence defendant within the calculated guideline range.

> 11.  The Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.  If defendant instructs his/her attorney to file a notice of appeal at the time sentence is imposed, the United States will seek specific performance of the waiver of appeal provision.  (Document No. 160) (emphasis in original).

With respect to Escobar's sentence determination, the written Plea Agreement states:

> 14.  Defendant is aware that the sentence will be imposed after consideration of the USSG, which are only advisory, as well as the provisions of 18 U.S.C. § 3553(a).  Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable USSG.  Defendant understands and agrees the parties' positions regarding the application of the USSG do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge.  If the Court should impose any sentence

up to the maximum established by statute, or should the Court order any or all of the sentence imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.  (Document No. 160).

As to the factual basis for his guilty plea, the Plea Agreement states:

16.  Defendant is pleading guilty because he/she **is** guilty of the charges contained in Count **One** of the Indictment.  If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt.  The following facts, among others, would be offered to establish the Defendant's guilt:

(a)     Beginning on or about 20 February 2006, and continuing up to about 21 February 2006, **Juan Antonio Escobar**, in the Houston Division of the Southern District of Texas, did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree with Bonifacio Hernandez, Leon Baldomero Deleon, Sugentino Percel, Eric Vasquez, Leonardo Arcemio Garcia, Jesus Alejandro Osorio, German Arias, and others, known and unknown, to possess with the intent to distribute cocaine, a Schedule II controlled substance, in the amount greater than 5 kilograms.

(b)     On or about February 2006, Hernandez, **Escobar**, and Deleon met inside the Bravos restaurant at the corner of Bingle and Northwest Freeway in Houston, Texas to discuss an impending cocaine deal. After meeting, **Escobar** and Deleon left and eventually went to 7430 Weatherhill, Houston, TX, where **Escobar** and Deleon entered the residence.

(c)     The prior day, Garcia had transported the cocaine from Mexico to 7430 Weatherhill in a white Dodge pickup with a hidden compartment and parked the Dodge in the garage.  **Escobar**, Deleon, and Garcia were present when cocaine was removed from a hidden compartment in the Dodge, with some put in black plastic trash bags.

(d)     Back on 21 February 2006, at approximately 5:00 p.m., **Escobar** and Deleon walked from the Weatherhill residence carrying a black canvas bag (containing an electronic money counter) and black plastic trash bags (containing cocaine).  Garcia was to wait at the Weatherhill residence until **Escobar** and Deleon collected cocaine proceeds for transport to Mexico, which was to be put in the Dodge's hidden compartment.

4

(e)     **Escobar** and Deleon drove from the Weatherhill residence to 8915 Alejo, Houston, TX, where the black canvas bag and the black plastic bags were carried inside.   **Escobar** then drove back to the Bravos restaurant.

(f)     At the restaurant, codefendants got into a 1993 green Ford Explorer and were driven by **Escobar** to the Alejo residence.   **Escobar** then drove to 3737 Watonga, Houston, TX, where he picked up other codefendants and drove them back to the Alejo residence.   Shortly thereafter, **Escobar**, Osorio, and Vasquez went back to 3737 Watonga where Osorio and Vasquez picked up a 2005 gray (IL tag D264919) minivan and returned back to the Alejo residence, where the minivan went into the attached garage and the Explorer then parked in the driveway.

(g)     While at the residence, several codefendants packaged kilogram-sized bricks of cocaine into seal bags, loading 10 of the bricks into a hidden compartment in the minivan.   **Escobar**, at times, was in the area in the residence where the cocaine was being packaged.

(h)     About two hours later, at approximately 11:10 p.m., **Escobar** left the Alejo residence, got in the Explorer and pulled out of the driveway. At about the same time, the garage door opened and the minivan pulled out.

(I)     Shortly after departing from the Alejo residence, the minivan was stopped by Harris County Deputies on Bingle Road.   Inside the minivan was Arias, who was driving, and Osorio, who was in the front passenger seat.   During the subsequent search, officers located 10 kilogram-sized bricks of suspected cocaine from the right rear quarter panel of the minivan where the narcotics dog had alerted.   Lab testing confirmed that the substance recovered was **cocaine** with a net weight of **9.89 kilograms**.   These bricks were wrapped in green cellophane and heat sealed in a bag and had axle grease on them.   While this traffic stop was occurring, the Explorer did a U-turn, drove past the stopped minivan, and drove off in the direction of the Alejo residence.

(j)     Just as the Explorer was driving down the street of the Alejo residence, the front door opened and Deleon, Percel, Hernandez, and Vasquez left the residence, quickly went down the street, and got into the Explorer.   The Explorer then drove exceeding fast through the neighborhood.

5

(k)     The Explorer was followed back to [ ] 3737 Watonga, where it was stopped by the Houston Police Department. **Escobar**, Deleon, Percel, Hernandez, and Vasquez were all inside the Explorer.

(l)     **Escobar** had called the Alejo residence and advised them of the traffic stop on the minivan and told them that he (**Escobar**) would pick them up. After **Escobar** picked up Deleon, Hernandez, Vasquez and Percel, they all discussed what they were going to do and where they would go to avoid law enforcement.

(m)     At the Alejo residence officers found 25 kilogram-sized bricks of suspected cocaine from the front bedroom. Lab testing confirmed that the substance recovered was **cocaine** with a net weight of **24.9 kilograms**. These bricks were identical to the 10 bricks of cocaine seized from the minivan in size, shape and wrapping. In addition, an electronic money counter was found inside a black canvas bag. Other items recovered: green cellophane from the kitchen/dining room area, heat sealing bags, axle grease, latex gloves (both used and unused), a heat sealing machine, heat sealing bags, paper towel with axle grease, and wrench and screwdriver sets. (Document No. 160) (emphasis in original).

In addition, Escobar and his attorney, Gerardo Montalvo, executed an addendum to the written Plea

Agreement, which states in pertinent part:

I have consulted with my counsel and fully understand all my rights with respect to the Indictment pending against me. My attorney has fully explained and I understand all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manuel which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

I have fully explained to the defendant [his] rights with respect to the pending Indictment. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to defendant the provisions of those Guidelines which may apply in this case. I have also explained to defendant that the USSG are only advisory and the court may sentence defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with the defendant. To my knowledge, the defendant's decision to enter into this agreement is an informed and voluntary one. (Document No. 160, p. 13).

6

At Escobar's November 3, 2006, Rearraignment, the Court engaged in an extended colloquy with Escobar to ensure that he had read the written Plea Agreement and had conferred with his attorney about the contents of the Plea Agreement.  The Court also advised Escobar of the consequences of his plea, including the maximum sentence he faced, the manner in which his sentence would be calculated, the factual basis of the plea, and the waiver provisions:

> The Court:  Have you had an opportunity to read the plea agreement that you are proposing to enter into today?
>
> The Defendant:  Yes, ma'am.
>
> The Court:  Have you gone over it with Mr. Montalvo, your attorney?
>
> The Defendant:  Yes, ma'am.
>
> The Court:  Do you feel like you understand what it is you are agreeing to in that agreement?
>
> The Defendant:  Yes, ma'am.
>
> The Court:  Do you understand what the government is agreeing to?
>
> The Defendant:  Yes, ma'am.
>
> The Court:  Does that plea agreement represent the entirety or all of the agreements or understandings you have with the government that prompted you to enter a plea of guilty in this case?
>
> The Defendant:  Yes, ma'am.
>
>        *             *            *
>
> The Court:  Mr. Mason, tell me what it is just in general, what it is, what the terms of the written plea agreement are.
>
> Mr. Mason:  Yes, your Honor.
>
> Defendant is going to be pleading to Count 1 of the Indictment; and if he persists in that plea, we will agree to move to dismiss Count 2.  We will not oppose any

reduction for acceptance of responsibility for timely notice to plead guilty and recommend sentencing at the low end of the guideline range, and agree to no upward adjustment for an aggravating role should apply to this conviction.

In exchange, he agrees to cooperate and debrief and if necessary testify for a 5K1.1 letter, which we may file in our sole discretion, to the forfeiture of property, if any, and a waiver of his appellate rights including collateral attacks.

The Court:  All right.  Mr. Escobar, does that sound like a fair and accurate summary of the written plea agreement that you propose to enter into today?

The Defendant:  Yes, ma'am.

            *                    *                    *

The Court:  Under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow to determine what the sentence will be in a criminal case.

Have you and Mr. Montalvo talked about how those guidelines may apply in your case?

The Defendant:  Yes, ma'am.

The Court:  Do you understand that the sentencing guidelines used to be mandatory but they're now advisory only?

The Defendant:  I understand now.

               *                    *                    *

The Court:  And even though the guidelines are no longer mandatory, I am still required to take a look at them and consider them when I determine what your sentence will be.  Do you understand that?

The Defendant:  Yes, ma'am.

The Court:  And I won't be able to tell you until after a probation officer has done an investigation of your case and has written a presentence report that will assist me in sentencing.  Do you understand that?

The Defendant:  Yes, ma'am.

8

The Court:  You and Mr. Montalvo will get a copy of that and the government will also get a copy of that presentence report, and each of you will be given an opportunity to make any objections that you may have to that report.  Do you understand that?

The Defendant:  Yes, ma'am.

The Court:  And then we will have a sentencing hearing.  And at that hearing I will rule on any objections that may have been made to the report, and I will also rule on motions or recommendations that may be made to me or any other matters that might be brought to my attention that would have impact or could have an impact on your sentence.  Do you understand that?

The Defendant:  Yes, ma'am.

The Court:  At the conclusion of that sentencing hearing, I will then be in a position to determine what your sentence is.  Do you understand that?

The Defendant:  Yes, ma'am.

The Court:  And it could be that when I pronounce sentence, the sentence I give you is more severe than the one that you and Mr. Montalvo may have estimated you might get when you were talking about how the guidelines might apply in your case.  Do you understand that?

The Defendant:  Yes, ma'am.

                    *                    *                    *

The Court:  Do you further understand that under the terms of the written plea agreement that you propose to enter into, you will be waiving or giving up virtually all of your rights to appeal any sentence that I impose, including any collateral right to appeal such as a habeas corpus.  Do you understand that?

The Defendant:  Yes, ma'am.

                    *                    *                    *

The Court:  All right.  Mr. Mason, tell me what it is the government is prepared to prove if we went to trial in this case.

Mr. Mason: Yes, your Honor.

If called to do so, the United States would prove beyond a reasonable doubt that on or about the 21st of February, 2006, Bonifacio Hernandez, Juan Escobar and Baldomero Deleon met inside the Bravos restaurant at the corner of Bingle and Northwest Freeway in Houston, Texas discussing the pending cocaine deal.

After the meeting, Mr. Escobar and Deleon left and went to 7430 Weatherhill in Houston where they entered the residence.

The prior day, Mr. Leonardo Garcia had transported cocaine from Mexico to that address in a white Dodge pickup with a hidden compartment and parked the Dodge in the garage. Escobar, Deleon and Garcia were present when the cocaine was removed from the hidden compartment in the Dodge, with some put in black plastic trash bags.

Back on the 21st, approximately the 21st of February at approximately 5:00 p.m., Escobar and Deleon walked from the Weatherhill residence carrying a black canvas bag (containing an electronic money counter) and black plastic trash bags (containing cocaine). Garcia was to wait at the Weatherhill residence until Escobar and Deleon collected cocaine proceeds for transport to Mexico, which was to be put in the Dodge's hidden compartment.

Escobar and Deleon drove from the Weatherhill residence at 8915 Alejo in Houston where the black canvas bag and the plastic bags were carried inside. Escobar then drove back to the Bravos restaurant.

At the restaurant, other co-defendants got into the 1993 green Ford Explorer and were driven by Escobar to the Alejo residence. Escobar then drove to 3737 Watonga where he picked up other co-defendants and drove them back to the Alejo residence. Shortly thereafter, Escobar, Osorio and Vasquez went back to 3737 Watonga where Osorio and Vasquez picked up a 2005 gray minivan and returned back to the Alejo residence, where the minivan went into the attached garage and the Explorer then parked in the driveway.

While at the Alejo residence, several co-defendants packaged kilogram-sized bricks of cocaine into sealed bags, loading 10 of the bricks into a hidden compartment in the minivan. Escobar, at times, was in the area of the residence where the cocaine was being packaged.

At approximately 11:10 p.m., Escobar left the Alejo residence, got in the Explorer and pulled out of the driveway. At about the same time, the garage door opened and the minivan pulled out.

Shortly after departing from the Alejo residence, the minivan was stopped by Harris County deputies on Bingle Road. Inside the minivan was German Arias, who was driving, and Mr. Osorio, who was in the front passenger seat. The subsequent search located the 10 kilogram-sized bricks of suspected cocaine from the right rear quarter panel of the minivan where the dog, a narcotics dog had alerted. Lab testing confirmed the substance was cocaine with a net weight of 9.89 kilograms. These bricks were wrapped in green cellophane and heat sealed in a bag and had axle grease on them. While this traffic stop was occurring, the Explorer did a U-turn, drove past the stopped minivan, and drove off in the direction of the Alejo residence.

As the Explorer was driving down the street of the Alejo residence, the front door opened and Baldomero Deleon, Mr. Percel, Mr. Hernandez and Mr. Vasquez left the residence, quickly went down the street and got into the Explorer.

The Explorer then drove exceedingly fast through the neighborhood. It was followed back to 3737 Watonga, where it was stopped by the Houston Police Department. Mr. Escobar, Deleon, Percel, Hernandez and Vasquez were all inside the Explorer.

Mr. Escobar had called the Alejo residence and advised them of the traffic stop of the minivan and told them that he, Mr. Escobar would pick them up. After Mr. Escobar picked up Mr. Deleon, Hernandez, Vasquez and Percel, they all discussed what they were going to do and where they would go to avoid law enforcement.

At the Alejo residence officers recovered 25 kilogram-sized bricks of suspected cocaine from the front bedroom. Lab testing confirmed the substance was cocaine with a net weight of 24.9 kilograms. These bricks were identical to the 10 bricks of cocaine seized from the minivan in size, shape and wrapping.

In addition, an electronic money counter was found inside a black canvas bag, and other items recovered included green cellophane from the kitchen/dining room area, heat sealing bags, axle grease, latex gloves (both used and unused), a heat sealing machine, heat sealing bag, paper towel with axle grease and a wrench and screwdriver sets.

The Court: Mr. Escobar, tell me in your own words what it is you did to commit the crime you are pleading guilty to this morning.

The Defendant: I knew Hernandez and Deleon were making the deal.

The Court: I'm sorry?

The Defendant: I knew that Hernandez and Deleon were making a deal, a drug deal.

The Court:  Yes.

The Defendant:  I was there when they were making it, and I just helped Deleon move one bag to one residence, and that's it.

The Court:  What Mr. Mason told me happened, do you have any disagreement with that?  Is that basically what happened?

The Defendant:  Yes, ma'am.

Mr. Montalvo:  There is only one minor.  The government has always said bags, plastic bags.

The Defendant:  There was only one bag.

Mr. Montalvo:  Just one bag.

The Defendant:  That I helped Deleon move from one residence to another.

Mr. Montalvo:  But other than that, everything else.

The Court: All right.  (Transcript of Rearraignment Hearing, Document No. 382, pp. 6, 8-11, 15-19).

Prior to sentencing, a pre-sentence investigation report ("PSR")  was prepared to which Escobar filed written objections.[2]  (Document No. 230).   The docket sheet shows that the Government responded to Escobar's objections to the PSR.  (Document No. 240).

Pursuant to the PSR, Escobar's guideline sentencing range was calculated as follows:  (1) Escobar had a base offense level of 34.  With respect to Escobar's relevant conduct assessment, the PSR states:

> 36.  Juan Antonio Escobar is held accountable for the sale, negotiation and storage of a total of 42.6 kilograms of cocaine, 13.6 grams of cocaine base, 7.7 grams of MDMA and 7.5 grams of marijuana.  The total of 42.6 kilograms of cocaine is derived from the 9.9 kilograms of cocaine seized in the mini-van driven by Osorio and Arias, 7.8 kilograms of cocaine seized from Escobar's home located at 7430 Weatherhill, Houston, Texas, and the 24.9 kilograms of cocaine seized from [ ] 8915 Alejo, Houston, Texas.  The cocaine base, MDMA and marijuana were also seized from Escobar's home located at 7430 Weatherhill.  It is noted, the 42.6 kilograms of cocaine alone results in a Drug Quantity Base Offense Level of 34.  The conversion of the additional drugs seized had no impact on the applicable Base Offense Level. Additionally, Escobar is held accountable for the two weapons, a Cabilondo y

---

[2] Escobar objected (Document No. 230) to several sections of the PSR including his offense conduct (paragraphs 13, 14, 16, 18, 21, 22, 23, 30 and 31) even though the objections were not relevant to the sentencing guideline computations.  In addition, Escobar objected to being held accountable for 42.6 kilograms of cocaine, 13.6 grams of cocaine base, 7.7 grams of MDMA, and 7.5 grams of marijuana.  Further, Escobar objected to being held accountable for two weapons. According to Escobar, he should have been only been held accountable for 7.8 kilograms of cocaine that was seized from his residence.  Because he should only have been accountable for 7.8 kilograms of cocaine, Escobar argued that his base offense should have been level 32.  In addition, Escobar objected to Paragraph 44 and the two level increase pursuant to U.S.S.G. § 2D1.1(b)(1).  According to Escobar, the two firearms were located in the master bedroom that was occupied by co-defendant Deleon and because he did not possess the weapons, his base offense level should not have been increased by two levels.  Also, Escobar objected to Paragraph 46 of the PSR because his base offense level was not decreased by two levels based on his limited and minor role in the offense under U.S.S.G. § 3B1.2(b).  Escobar also corrected errors in Paragraphs 67 and 68 concerning family and personal data.  According to Escobar's calculation, with a base offense level of 32, which was reduced by two levels based on his limited role in the offense, and by another three levels based on his acceptance of responsibility, he had an adjusted offense level of 27, and with a criminal history category of IV, would have resulted in  a  guideline range of punishment of 100 to 125 months. (Document No. 230).

Ciavitoria .45 Caliber pistol and a Ruger 9 mm pistol, which were confiscated when agents were conducting a federal search warrant at his home.  Finally, Escobar is seen to have neither an aggravating or mitigation role in this drug conspiracy.

(2) Because two firearms, a Cabilondo y Ciavitoria .45 Caliber pistol, and a Ruger 9 mm pistol were seized during a search of Escobar's residence, under U.S.S.G. § 2D1.1(b)(1), his offense level was increased by two levels. (3)  Because Escobar accepted responsibility for his actions and did so in a timely manner, pursuant to U.S.S.G. § 3E1.1(a) and (b), his offense level was reduced by three levels. (4)  With an adjusted base offense level of 33 and with a criminal history of category VI, Escobar had a guideline sentence range of 188 to 235 months.

On March 23, 2007, Escobar was sentenced.  (Document No. 289, Transcript of Sentencing Hearing, Document No. 383).  With respect to Escobar's objections to the PSR regarding drug quantity, firearm enhancement, and role in the charged offense, Judge Harmon adopted the PSR's findings:

> The Court:  Mr. Montalvo has made some objections to the report, and I am going to go over those with him in just a minute; but I want to find out from you if you have any objections that you would like to make to the presentence report that Mr. Montalvo did not make on your behalf?
>
> The Defendant:  None.
>
> Mr. Montalvo:  Your Honor, well, by one information this morning, it would be — I did file an objection to paragraph 36.  I just want to add for the record, probation, that the probation officer's response was that he admitted to all of the quantities of cocaine during the rearraignment and that's not true.
>
> I have the factual basis of the rearraignment, and he did not admit to all of the quantities.  The way the factual bases were written, it covered the whole scope of what happened.  They found drugs here, they found drugs here, they found drugs here.
>
> I believe the Court asked him about what happened.  Yes, that's what they did.  They found drugs in those three places.  But he admits to possessing them.  I think that's

14

what Mr. Escobar wants to tell the Court; that the probation office, the factual basis presented in court, defendant's admissions to possessing these quantities. And Mr. Escobar is just telling the Court he didn't admit to possessing all of the quantities involved in the conspiracy.

The Court:  Okay.  Did you want to respond to that?

Mr. Magidson:  Just simply that the factual basis was about the entire conspiracy and that he agreed that if those facts came to light that they would be proven true.  And I believe that he is saying he didn't physically possess all of the drugs in question.

The Court:  Right.

Mr. Magidson:  But it's the government's position that he was a member of the conspiracy and that this was the amount involved in the conspiracy.  And the factual recitation is accurate, and we stand by the facts as stated in the plea agreement.

The Court: Yes, all right.

Mr. Montalvo:  Again, Mr. Escobar was just bringing it up because of the way it's written.  The probation officer has said he admitted to possessing and then just all the quantities, which is not true.  But as the government says, we agreed to the factual basis.

The Court:  Right, right.  You agree to the factual representation.

Mr. Montalvo:  That's correct.

The Court:  Are there any other objections that you would like to flush out that you haven't already done on the paper?

Mr. Montalvo:  None other than the ones I filed, your Honor.

The Court: Obviously there were some objections that were made just as clarification of factual matters that the probation officer accepted.  But as to the true objections that have to do, I think with his role and the amount of drugs, and there was another one.

Mr. Montalvo:  The weapons.

Mr. Magidson:  The weapons.

15

The Court:  The weapons.  All those, I'm going to overrule the objections to those matters and adopt the presentence report as my own, both the findings of fact and the application of the guidelines to the facts, and find a total offense level of 33, a criminal history category of 4, which gives a guideline provision range of 188 to 235 months.

Mr. Montalvo, anything you would like to say before I pronounce sentence?

Mr. Montalvo:  I would just ask that — I know the Court's ruled on my objections. I would just ask the Court to consider some of the other sentences in this case.  With the exception of — I think three individuals went to trial in this case.  Obviously except those individuals who have not accepted responsibility like Mr. Escobar has, I feel – and this is not by way of objection — but I feel his role in this organization was not — was lower than some of the other individuals that have actually testified or pled guilty in this case.

I would just ask the Court to consider a sentence at the low end of the guidelines.  His family is here, his mother, his child, a friend of the family, his sister is here in support of him.  And I would just ask for a sentence at the low end of the guidelines.  I believe the government is going to recommend that as well.

Mr. Magidson:  Your Honor, pursuant to our plea agreement — and we want to make sure we are following everything we filed, and agree with Mr. Montalvo— we are recommending the low end of the guidelines.  We believe that the calculations are correct and that a 188 month sentence would be appropriate in this case.

The Court: All right.  Mr. Escobar, anything you would like to say before I pronounce sentence?

The Defendant:  I just want to apologize to my family for putting them through all this.  I apologize to the Court for getting me out of this trouble, and that's it. (Transcript of Sentencing Hearing, Document No. 383, pp. 3-6).

Escobar was sentenced to a term of imprisonment of 188 months, to be followed by a five year term of supervised release.  Escobar was also ordered to pay a special assessment of $100.00.  (Document No. 289, Transcript of Sentencing Hearing, Document No. 383, pp. 8-10).  With respect to Escobar's sentence, Judge Harmon stated:

The defendant Juan Antonio Escobar is before the Court for sentencing after having entered a plea of guilty to conspiracy to possess with intent to distribute five

16

kilograms or more of cocaine.  He was held accountable for a total of 42.6 kilograms of cocaine, 13.6 grams of cocaine base, 7.7 grams of MDMA and 7.5 grams of marijuana.  He is also held accountable for the two weapons, which were confiscated from his residence at the time the co-defendant Leonardo Arsenio Garcia was arrested.

This offense is his fourth felony conviction, and it does not appear that any of the other sanctions imposed have had any impact on deterring him from criminal conduct.  And his prior convictions also include drugs and weapons, which make him a danger to the community.

And apparently he did not have legal permission to be in the United States after December 24, 1998, and has been deported from the United States on three separate occasions and was in the United States illegally when the instant offense occurred.

He continues to show disrespect for the laws of the United States and continues to show a pattern of non-compliant behavior.  Nevertheless, both the government and the defense have agreed in their plea agreement that he should get a sentence at the low end of the guideline range, and I believe that a sentence of 188 months will be sufficient to punish him for his criminal behavior and promote respect for the laws of the United States and will address the sentencing objectives of punishment, incapacitation and general deterrence as contemplated by 18 United States Code, Section 3553(a).  (Document No. 383, Transcript of Sentencing Hearing, pp. 6-8).

Judgment was entered on March 29, 2007.  (Document No. 306).  Escobar appealed to the Fifth

Circuit Court of Appeals.  (Document No. 305).  Escobar's new appellate counsel filed a brief in

accordance with *Anders v. California*, 386 U.S. 738 (1967), and moved to withdraw as counsel on

April 23, 2008.  Escobar responded to counsel's submission, and raised the issues contained in the

instant § 2255 motion.  On August 20, 2008, the Fifth Circuit granted counsel's motion to withdraw

and dismissed Escobar's appeal.  The Fifth Circuit wrote:  "[o]ur independent review of the record,

counsel's brief, and Escobar's response discloses no nonfrivolous issue for appeal." *United States v.*

*Escobar*, 2008 WL 3876465 (07-20261) (5th Cir. August 20, 2008).  The docket sheet reveals that

Escobar filed a § 2255 motion (Document No. 419) and a Memorandum in Support (Document No.

420) on September 18, 2008.  In his § 2255 motion, Escobar  argues that his plea was unknowing

and involuntary because his counsel failed to investigate and to object to his criminal history category; failed to contest the two level weapons enhancement; failed to secure a sentence reduction that had been promised by the government; and with respect to appellate counsel, failed to perfect the record and issues on appeal because counsel filed an *Anders* brief.   Additionally, Escobar claims Fifth Amendment and Sixth Amendment violations, all of which relate to the quantity of drugs he was held accountable for, the firearms he was held accountable for, and the absence of a sentence reduction based on his minor role in the offense.   According to Escobar, the government breached the plea agreement when the prosecutor urged the Court to enhance his guideline sentencing range based on facts not admitted by Escobar, namely the drug quantity and two weapons, and as a result he received a sentence greater than that he expected based on his admission at the rearraignment hearing that he was responsible for one bag of cocaine.   According to Escobar, he did not admit to all the quantities involved in the conspiracy.   Escobar further argues the government breached the plea agreement by failing to recommend a minor role adjustment under U.S.S.G. § 3B1.2, which he maintains he was eligible for.   According to Escobar's calculation, his sentence should have been based on five kilograms of cocaine, and because he did not possess the firearms found at his residence, his sentence should not have been increased two levels. According to Escobar, he "did not expect that his sentence would be enhanced based on any fact other than those he agreed to in the plea agreement." (Document No. 420, p. 3).   Based on Escobar's calculation, his base offense level should have been 32, which should have been reduced by two levels under U.S.S.G.       § 3B1.2(b), by three levels for acceptance of responsibility, and by two levels under § 2D1.1(a)(3)(I) for his minor role in the offense, for an adjusted offense level of 25, and with a criminal history category IV, would have resulted in a advisory guideline sentence of 84 months.

18

The Government has answered and has moved to dismiss the instant action on the ground that Escobar, as part of his written Plea Agreement, waived the right to bring a motion under § 2255, and that his written Plea Agreement should be enforced. (Document No. 423). The Government further argues that even assuming that Escobar had not waived his right to pursue relief under      § 2255, he nevertheless is not entitled relief, because the gist of Escobar's contentions relate to his counsel's actions with respect to the length of his sentence and are barred by the waiver. The Government further argues that his claims, in any event, are without merit, because Escobar's plea was knowing and voluntary, and there was no breach of the agreement by the Government. The Government further argues that Escobar's ineffective assistance of counsel claim is without merit as the record clearly shows that counsel in fact made all the objections that Escobar contends should have been made relating to his criminal history, weapons' assessment, relevant conduct, and any claim under *United States v. Booker*, 543 U.S. 220 (2005), and that with respect to appeals counsel, counsel filed Escobar's appeal and that the filing of an *Anders* brief does not *per se* constitute ineffective assistance of counsel. Escobar has filed a reply to the Government's Motion to Dismiss. (Document No. 422). This § 2255 proceeding is ripe for ruling

## II. Discussion

### A.  Wavier

A defendant's waiver of his statutory right to collaterally challenge his conviction with a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255, like a waiver by a defendant of his right to appeal, is generally enforceable if the waiver is both knowing and voluntary. *United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994) (Enforcing defendant's voluntary and knowing

19

waiver of § 2255); *United States v. McKinney,* 406 F.3d 744, 746-47 & n.5 (5th Cir. 2005) (Enforcing, post-*Booker*, a waiver of appeal right that was signed prior to the issuance of *Booker).* Such waivers, however, do not "preclude review of a sentence that exceeds the statutory maximum." *United States v. Hollins*, 97 Fed. Appx. 477, 479 (5th Cir. 2004).  In the context of a plea agreement waiver, a sentence exceeds the statutory maximum only when it exceeds the maximum allowed by statute. *United States v. Bond*, 414 F.3d 542, 546 (5th Cir. 2005); *United States v. Cortez*, 413 F.3d 502, 503 (5th Cir.), *cert. denied*, 126 S.Ct. 502 (2005). In addition, when a defendant alleges that his counsel was ineffective in negotiating a plea agreement, such ineffectiveness claims are not barred by the waiver.  *See United States v. White,* 307 F.3d 336, 343 (5th Cir. 2002) ("[i]neffective assistance of counsel argument survives a waiver of appeal only when the claimed assistance directly affected the validity of that waiver or the plea itself."); *United States v. Cockerham,* 237 F.3d 1179, 1187 (10th Cir. 2001) ("[W]e hold that a plea agreement waiver of postconviction rights does not waive the right to bring a § 2255 petition based on ineffective assistance of counsel claims challenging the validity of the plea or the waiver.  Collateral attacks based on ineffective assistance of counsel claims that are characterized as falling outside that category are waivable."), *cert. denied*, 534 U.S. 1085 (2002); *DeRoo v. United States*, 223 F.3d 919, 924 (8th Cir. 2000) ("A defendant's plea agreement waiver of the right to seek section 2255 post-conviction relief does not waive defendant's right to argue, pursuant to that section, that the decision to enter into the plea was not knowing and voluntary because it was the result of ineffective assistance of counsel."); *Mason v. United States,* 211 F.3d 1065, 1069 (7th Cir. 2000) (where the ineffectiveness claims raised in a  § 2255 motion relate to counsel's performance at sentencing, the defendant's plea agreement waiver of this right to

challenge his conviction in a § 2255 proceeding is enforceable), *cert. denied*, 531 U.S. 1175 (2001).[3]

Ineffective assistance of counsel claims, including challenges to counsel's performance at sentencing,

which do not relate to the validity of the Plea Agreement and waiver, can be waived. *White*, 307 F.3d

at 343.  Otherwise, "[i]f all ineffective assistance of counsel claims were immune from waiver, any

complaint about the process could be brought in a collateral attack by merely challenging the

attorney's failure to achieve the desired result.  A knowing and intelligent waiver should not be so

easily evaded." *White,* 307 F.3d at 344.

    Here, pursuant to a written Plea Agreement, Escobar waived his right to appeal and waived

his right to collaterally attack his plea, conviction and sentence.  As discussed above, the written Plea

Agreement was explicit with respect to the waiver of the right to appeal and to pursue collateral

relief. (Document No.160, ¶ 9-11).

    In addition, at his Rearraignment on November 3, 2006, the Court engaged in an extended

colloquy to ensure that Escobar was competent to participate in the Rearraignment proceedings, had

read the written Plea Agreement, discussed the contents of the written Plea Agreement with counsel

and understood the agreement, that no promises had been made to induce his plea, that he understood

the offense to which he was pleading guilty, the maximum sentence he faced on Count 1, namely a

---

[3] There are some other limited situations in which a plea agreement waiver of the right to seek collateral review under § 2255 is not enforceable, such as where the sentence imposed violates the terms of the plea agreement, the sentence is illegal, or the Government has suppressed exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).  *See DeRoo*, 223 F.3d at 923 ("defendants cannot waive their right to appeal an illegal sentence or a sentence imposed in violation of the terms of an agreement"); *United States v. Baramdyka,* 95 F.3d 840, 843 (9th Cir. 1996) ("the waiver of a right to appeal may be subject to certain exceptions such as claims involving a breach of the plea agreement, racial disparity in sentencing among codefendants or an illegal sentence imposed in excess of a maximum statutory penalty"), *cert. denied,* 520 U.S. 1132 (1997); *United States v. Hollins*, 97 Fed. Appx. 477, 479 (5th Cir. 2004) (Waiver does not preclude review of a sentence that exceeds the statutory maximum).  None of those circumstances is at issue in this proceeding.

term of imprisonment of not less than ten years and up to life imprisonment, the rights he was giving up by virtue of his guilty plea, and the factual basis of the charges and his guilty plea. The Court also advised Escobar about the waiver provisions.   Based on Escobar's responses during the lengthy colloquy, Judge Harmon concluded that Escobar's guilty plea and waiver of his right to appeal and collaterally attack his conviction and/or sentence was knowing and voluntary.

Given Escobar's statements on the record, which carry a strong presumption of verity, *Blackledge v. Allison,* 431 U.S. 63, 74 (1977), that he had read and discussed the written Plea Agreement with his counsel, that he understood the statutory and constitutional rights which he was waiving, that he understood his possible range of punishment and how his sentence would be computed, and that he understood that he had waived his right to appeal and to file a post conviction proceeding, as well as Judge Harmon's determination that Escobar's plea was knowing and voluntary, Escobar has not shown that his plea was not counseled, knowing and voluntary, and upon this record, Escobar's plea agreement waiver of his right to collaterally attack his conviction with a § 2255 motion is enforceable. Escobar's sentence does not exceed the statutory maximum – that is, the maximum sentence allowed by statute, *see* 18 U.S.C.§ 2252A(a)(5)(B) (maximum term of life Count one).  In addition, the Fifth Circuit has already determined that Escobar's waiver of his right to appeal is valid.  Moreover, Escobar's ineffective assistance of counsel claims relate to counsel's performance at sentencing, and not to the validity of the Plea Agreement and waiver, and therefore are covered by the waiver.

Because Escobar's plea agreement, and waiver of appeal and collateral rights contained therein, were knowingly, voluntarily, and intelligently entered, because Escobar has waived his right to bring a § 2255 motion, and because that waiver is valid and should be enforced, it serves as a bar

to the instant § 2255 motion.  Upon this record, the Government is entitled to summary judgment on Escobar's claims pursuant to Escobar's plea agreement waiver,[4] *see  Mason v. United States*, 211 F.3d 1065, 1069 (7th Cir. 2000); *Davila*, 258 F.3d at 451-52; *United States v. Nguyen*, 2005 WL 14090 (E.D. La. 2005); *Morua v. United States*, 2005 WL 1745474 (S.D.Tex. 2005) (Hittner, J.); *United States v. Rohmfeld*, 2006 WL 126636 (S.D.Tex. 2006) (Jack, J.), and this § 2255 proceeding is subject to dismissal.

### B.  Merits

Even if Escobar's waivers were not enforceable, the record supports the conclusion that no relief is available to Escobar on the merits of his ineffective assistance of counsel claims and other claims which attack the calculation of his advisory guideline sentence.  Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had.  *Strickland*, 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable.  *Id*. at 687-88.  The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable.  *Id*. at 694-95.  Under *Strickland*, a petitioner must establish

---

[4] Under Rule 12 of the Rules governing § 2255 motions, the Federal Rules of Civil Procedure, including Rule 56, which provides for summary judgment, are generally applicable. Under Rule 56(c), summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Here, because the evidence in the record shows that Escobar's plea was knowing and voluntary, there is no genuine issue of material fact relative to the validity of Escobar's guilty plea or his waiver of his direct appeal and waiver of pursuing collateral review under § 2255.  Summary judgment is therefore warranted on Escobar's plea agreement waivers.

both deficiency and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy."  *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel.  The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record.  Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984).   The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct.  *Strickland,* 466 U.S. at 690.  "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116

F.3d 1115, 1122 (5th Cir. 1997)).  The court's role "under § 2255 is not to audit decisions that are within the bounds of professional prudence."  *United States v. Molina-Uribe*,  429 F.3d. 514, 518 (5th Cir. 2005), *cert. denied*, (2006).  In addition, conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition.  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Thus, Escobar  "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Id.*  The specific example of counsel's ineffective assistance, which Escobar cites to in support of ineffectiveness claim, that counsel failed to investigate his criminal history category, failed to object to the weapons adjustment on the basis of *Booker*, failed to enforce the government's promise to recommend a reduction  of his sentence, and failed to enforce the government's promise of a minor role adjustment, are all refuted by the record.  The record clearly shows that counsel made all the objections that Escobar contends he failed to make in his written objections to the PSR and the same objections were argued at the Sentencing Hearing.  Escobar's counsel objected to factual errors in Escobar's criminal history even though the errors did not affect his sentencing range, objected to the two level increase based on the firearms seized at Escobar's residence, and raised Escobar's objections to drug quantity, namely that Escobar at his Rearraignment colloquy admitted that he physically possessed one bag yet further admitted to the factual basis, which encompassed the drug conspiracy.  Regardless of Escobar's contentions, the record shows that Escobar accepted the factual

basis of the written Plea Agreement which covered the scope of the conspiracy and drug quantities found at three locations.  Escobar's ineffectiveness allegations are controverted by the record and without merit.  Likewise, to the extent Escobar contends that counsel failed to enforce the written Plea Agreement based on his claim that the government failed to recommend a reduction in sentence and adjustment based on his minor role in the offense, again the record refutes these contentions. Escobar received a three level adjustment for acceptance of responsibility.  As to Escobar's contention that under U.S.S.G. § 3B1.2(b) his offense level should have been reduced by two levels based on his minor role in the offense, counsel objected on this ground.  The Court found otherwise and concluded that Escobar was not less culpable than this co-defendants.  Finally, to the extent Escobar argues that his appellate counsel was ineffective for failing to raise the above issues on his direct appeal, the record shows that counsel filed a notice of appeal and submitted an *Anders* Brief. The filing of an *Anders* Brief does not *per se* establish ineffective assistance of counsel as argued by Escobar.  The Fifth Circuit Court of Appeals reviewed the brief along with Escobar's submissions and concluded there was no merit to Escobar's contentions and dismissed the appeal as frivolous. Escobar was not denied his appeal or right to appeal by any actions of his counsel.  The record shows that written Plea Agreement at ¶ 10, clearly states that no sentence had been determined and that any estimate by counsel was a prediction not a promise and "**did not induce his/her guilty plea**." (emphasis in original).  The written plea agreement also addressed the applicability of *United States v. Booker* to the sentencing guidelines.  The record further shows that Escobar was advised by Judge Harmon about his waivers, and the calculation of his sentence at his Rearraignment hearing.  Judge Harmon stated that she would not be in a position to know definitively what Escobar's sentence would be *until* the sentencing hearing.  Judge Harmon further stated that the Court was not bound

by the written Plea Agreement, and could depart, upward or downward, from the advisory guideline range[5].  The record affirmatively shows that Escobar's counsel was not deficient and there is no evidence that any alleged error prejudiced Escobar within the meaning of *Strickland.*

In conclusion, Escobar has offered no proof as to how his counsel's performance was objectively deficient, and no proof that such deficient performance prejudiced him in any way.  *See Strickland,* 466 U.S. at 687.  Therefore, no relief is available under § 2255 on the ineffective assistance of counsel claims.

## IV. Conclusion and Recommendation

Based on the foregoing, and the conclusion that Escobar's guilty plea was knowing and voluntary and that his waiver of his right to collaterally attack his conviction should be enforced, and further, that no relief is available to Escobar on the merit of his claims, it is

RECOMMENDED that the Government's Motion to Dismiss (Document No. 423) be GRANTED, that Movant Escobar's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 419) be DENIED, and that this § 2255 proceeding be DISMISSED with prejudice.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual

---

[5] To the extent Escobar challenges the calculation of his sentence, the court's technical application of the advisory sentencing guidelines does not give rise to a constitutional claim cognizable under § 2255.  *United States v. Segler*, 37 F.3d 1131, 1134 (5th Cir. 1994); *United States v. Faubion*, 19 F.3d 226, 232-22 (5th Cir. 1994).  As such, no relief would be available on this claim.

findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982),

*cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).

Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved

party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile*

*Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).

Signed at Houston, Texas, this 27th day of April, 2009.

Frances H. Stacy
United States Magistrate Judge